**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:19-CR-322 RLW |
| | ) | |
| KEITH JACKSON, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This case is before the Court on pretrial matters. Defendant Keith Jackson was federally indicted on January 8, 2019, on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g) (ECF No. 2). All pretrial matters were referred to United States Magistrate Judge David D. Noce pursuant to 28 U.S.C. § 636(b). The Court will now conduct a de novo review of Judge Noce's Order and Recommendation (ECF No. 80) and Jackson's Objections thereto (ECF Nos. 87, 88). For the following reasons, the Court will sustain Jackson's Objections in part, modify the Order and Recommendation's factual findings in part, adopt the Order and Recommendation's legal conclusions in part, and deny Jackson's Motion to Suppress.

**I. Procedural Background**

Defendant Jackson was arrested on April 16, 2021, and was taken before United States Magistrate Judge David D. Noce for an initial appearance. (ECF No. 18.) Judge Noce appointed the Federal Public Defender to represent Jackson (ECF No. 23) and the record indicates Jackson made an oral motion to suppress (ECF No. 20). Jackson was ordered detained. (ECF No. 28.)

Judge Notice ordered that any pretrial motions be filed by June 30, 2021 (ECF No. 25). Assistant Federal Public Defender Mohammed G. Ahmed entered an appearance for Jackson

(ECF No. 29) and subsequently filed four motions for additional time to determine whether to file pretrial motions, each of which were granted. (ECF Nos. 31, 32, 34-37, 39, 41.)

Jackson filed a pro se motion to appoint substitute counsel in December 2021 based on a claim of "(1) an irreconcilable conflict that has resulted in (2) a complete breakdown in attorney-client communications." (ECF No. 38 at 1.) Judge Noce conducted a hearing on Jackson's motion to appoint substitute counsel on January 18, 2022 by Zoom video teleconference. (ECF No. 42.) On the same day, Judge Noce granted the motion and appointed as substitute counsel Jackson's current attorney, James L. Miller. (ECF Nos 43, 44.)

Mr. Miller filed a motion to withdraw from Jackson's representation on March 28, 2022 (ECF No. 45) which stated he had a Zoom meeting with Jackson on March 22, 2022 to determine if any pretrial motions would be filed or waived. The motion further states, "Counsel discussed issues raised by Defendant and informed him that after a thorough review of case law, there are no pretrial motions to be filed. Defendant informed Counsel that a pretrial motion must be filed. Defendant further informed Counsel that since he will not file any pretrial motions, he no longer desires him as attorney and instructed him to withdraw as counsel." (Id. at 1.) Jackson filed a pro se motion to appoint substitute counsel which alleged that defense counsel was incompetent because he had a different interpretation and understanding of relevant legal precedent than Jackson had, and refused to file any pretrial motions resulting in a complete breakdown in communication. (ECF No. 47 at 1-3).

Judge Noce held a hearing on the two motions by video teleconference on April 7, 2022, reviewed the age, nature, and history of the case, noted that an oral motion to suppress was on file. Judge Noce asked Jackson, "[W]hat's the nature of any motion that hasn't been filed that

you would like to file?" and Jackson answered, "A motion to suppress evidence." (Hrg. Tr., ECF No. 60 at 8:6-9.) Judge Noce then stated,

> Okay. Well, that's what we have in front of us, and we're going to take it up on May 16th. In such cases where the Government acquires its evidence without a search warrant the Government then has the burden of proving that the evidence was lawfully constitutionally acquired. That would be to my perception the seizure of the firearm, perhaps, from the street if that's what the Government's evidence is.
>
> So we're going to go forward on it. Mr. Jackson, you seem to me you're articulate. If you're the author of those documents, you certainly have knowledge -- more than a passing knowledge of what the law is. So we will have a hearing unless it's disposed of prior to May 18th.

(Id. 8:10-22.)

Judge Noce then asked Jackson if he wanted to make a record before the hearing recessed, and Jackson explained the disagreement between himself and defense counsel with respect to Supreme Court precedent concerning search warrants as applied to the facts of the case. (Id. 9:19-11:18.) Defense counsel then stated his position on the matter. (Id. 12:13-13:20.) Judge Noce stated that Jackson has had "two competent lawyers" and he would not bring in a third "for a very simple ordinary case like this." (Id. 14:8-11.) Judge Noce gave defense counsel until April 13, 2022 to file a new motion, and stated that otherwise the Court would "go forward on the oral motion to suppress … on May 16." (Id. 14:21-24.) Judge Noce denied both defense counsel's motion to withdraw and Jackson's motion for substitute counsel. (ECF Nos. 49, 50).

Jackson filed Objections (ECF No. 52) to Judge Noce's oral orders denying defense counsel's motion to withdraw and Jackson's motion to appoint substitute counsel. This Court reviewed the entire record of this matter and denied Jackson's Objections by Order of May 24, 2022 (ECF No. 59.)

Defense counsel filed a motion to continue the evidentiary hearing but did not file a new motion to suppress. Judge Noce held an evidentiary hearing on Jackson's oral motion to suppress on June 21, 2022 (ECF No. 63). The purpose of the hearing was to determine whether two items of evidence seized from Jackson should be suppressed: a Smith & Wesson .380 handgun and 4.49 grams of heroin. As a preliminary matter, defense counsel stated that Jackson would represent himself at the hearing because counsel did not want to file any pretrial motions. Defense counsel asked for a continuance of the hearing, however, to allow Jackson additional time to review discovery recently received from the government, primarily an eleven-page search warrant that was never executed. Judge Noce denied the request for a continuance after the government represented that although the late-produced warrant had been signed by a judge, it was never executed and nothing was seized as a result of its issuance. (Evid. Hrg. Tr., ECF No. 72, 2:19-7:2.)

At the hearing, the Government presented the testimony of Mark A. Berry, a detective with the St. Louis County Police Intelligence Unit, and introduced several exhibits. (ECF No. 65, Exhibit List). Jackson personally cross-examined Detective Berry. Through Barry's testimony, Jackson introduced two exhibits into evidence: Affidavit in Support of Search Warrant with Count Order (Defendant's Exhibit A), and Call Detail Records (Defendant's Exhibit B). Defense counsel acted as standby counsel during the hearing, and offered slight technical assistance to Jackson.

During Jackson's cross-examination of Detective Berry, the government produced an email containing GPS longitude and latitude records. (ECF No. 72, 35:20-37:20.) After a brief unrelated recess, defense counsel informed Judge Noce that the new information contained in the email "changes [Jackson's] entire argument." (Id. 39:15-25.) Judge Noce informed Jackson that

after the hearing ended, a transcript would be prepared, he would receive a copy, and would have the opportunity to file a "written argument about the outcome of the hearing," so the matter would proceed. (Id. 40:1-9.)

Jackson resumed his cross-examination of Detective Berry and questioned him about whether Jackson consented to provide a DNA sample by means of buccal swabs after his arrest. (Id. 40:25-42:16.) This line of questioning added a new and completely different issue regarding whether DNA evidence from the buccal swabs should be suppressed.  As such, it orally supplemented Jackson's oral motion to suppress. [1] The government engaged in redirect questioning on the topic. (Id. 44:15-45:21.)

Judge Noce then asked Jackson if he wanted to present his own testimony under oath for his side of the hearing and Jackson stated that he did. (Id. 46:22-25.) Judge Noce reminded Jackson of his rights to remain silent and to give testimony in a pretrial suppression hearing without it being used in the government's case in chief at trial. Judge Noce cautioned Jackson that his testimony at the hearing could be introduced at trial if Jackson took the stand and testified differently. (Id. 47:8-22.)

Jackson was placed under oath and Judge Noce told defense counsel it "would probably be helpful to the Court if you were to engage in a question and answer format with Mr. Jackson." (Id. 48:4-6.) The following discussion ensued:

> MR. MILLER: Judge, just for the record, I'm not entirely sure what Mr. Jackson is going to, wants to testify about.
>
> THE COURT: Okay.

---

[1] "Under Federal Rule of Criminal Procedure 47(b), a motion need not be in writing when it is made during a hearing." United States v. Bee, 2023 WL 411379, at *2, __ F. App'x __ (8th Cir. Jan. 26, 2023) (unpublished per curiam); Rule 47(b), Fed. R. Crim. P. The Magistrate Judge addressed Jackson's motion to suppress the DNA evidence in the Order and Recommendation.

MR. MILLER: So I don't really have questions prepared to lead him without -- I don't know what he's -- I mean ...

THE COURT: I don't want you to lead him. I don't think it's appropriate for the Government counsel to lead him.

You're familiar with the case. You can ask him generic questions about what he wants to say.

MR. MILLER: I guess I'm in a position where I don't --

THE COURT: Obviously.

MR. MILLER: I barely know what his whole argument is.

THE COURT: Just have a seat, please.

MR. MILLER: Okay.

(Id. 48:15-49:4.)

Jackson briefly testified in his own behalf. Jackson stated he arrived in Missouri on January 3, 2019, and went to visit some family members in Jennings, Missouri on January 4, 2019. Also on January 4, the Indiana detective called Jackson's cell phone multiple times between 12:00 p.m. and 1:00 p.m. Jackson felt harassed because of the calls and broke the phone around 1:00 p.m. (Id. 49:20-50:9.) The government did not ask Jackson any questions. (Id. 49:20-50.)

A transcript of the hearing was prepared and the parties filed post-hearing briefs (ECF No. 74, 75). The government filed a Response to Jackson's brief (ECF No. 76), and Jackson filed a Reply to the government's Response (ECF No. 79). Jackson prepared all of his post-hearing briefing pro se.

Judge Noce issued an Order and Recommendation (ECF No. 80) on November 7, 2022, which recommends that Jackson's oral motion to suppress evidence be denied as to the Smith & Wesson .380 handgun, the 4.49 grams of heroin, and the DNA evidence from the buccal swabs.

Judge Noce denied as moot the government's oral motion for a determination of the admissibility of arguably suppressible evidence.

Jackson and his defense counsel filed separate motions for extension of time to file objections (ECF Nos. 81, 82). This Court granted the motion filed by defense counsel and denied Jackson's pro se motion as moot. (ECF No. 84). Defense counsel then filed a second motion for extension of time to permit Jackson's pro se Objections, which Jackson had placed in the mail, to reach the Clerk's Office.

At that point in the case, the Court had not reviewed the Order and Recommendation or the parties' post-hearing briefing, and was familiar only with the record concerning Jackson's Objections to the Magistrate Judge's orders denying defense counsel's motion to withdraw and Jackson's motion to appoint substitute counsel and the motions for extension of time. The Court denied the second motion for extension of time to file pro se Objections, stating—

> There is no constitutional or statutory right to simultaneously proceed pro se and with benefit of counsel." United States v. Agofsky, 20 F.3d 866, 872 (8th Cir. 1994). See also Abdullah v. United States, 240 F.3d 683, 686 (8th Cir. 2001) ("A district court has no obligation to entertain pro se motions filed by a represented party."). Because Defendant is represented by counsel, the Court will not consider any filings by Defendant unless they are made through his appointed counsel. Specifically, the Court will not consider any pro se objections that Defendant may file to the Order and Recommendation.

(Order of Dec. 2, 2022, ECF No. 86 at 1.)

The Order of December 2, 2022 sets out this Court's general policy concerning pro se filings by represented parties. Upon receipt and review of Jackson's Objections and the case file as a whole, however, the Court issued an Order on December 8, 2022 that stated it may consider Jackson's pro se Objections because the Magistrate Judge had allowed Jackson to represent himself with respect to the motion to suppress (ECF No. 89). The Court also ordered the United States to respond to Jackson's Objections and provided a deadline for Jackson to reply. In

accordance therewith, the United States filed a Response to Jackson's Objections (ECF No. 94). Jackson timely filed a Reply in support of his Objections (ECF No. 96).

The Order and Recommendation and Jackson's Objections thereto are now before the Court for de novo review.

## II. **Findings of Fact**

The Court will adopt most of the Magistrate Judge's factual findings, except as discussed below, but restates the facts for purposes of clarity in the record.

A warrant for Jackson's arrest was issued on November 1, 2018, in the Elkhart, Indiana Circuit Court, for his failure to appear in court on pending charges of Unlawful Possession of a Firearm by a Serious Violent Felon, Driving While Suspended, and providing false information to law enforcement resulting in substantial hindrance to a law enforcement process. (Gov't. Hrg. Ex. 4, ECF No. 68-4.) The warrant stated that defendant was to be held without bond. (Id.)

Jackson traveled from Indiana to Missouri on January 3, 2019, and stayed the night in a motel outside the metropolitan St. Louis area. Jackson went to Jennings, Missouri, to visit a family member on January 4, 2019.

On January 4, 2019, South Bend, Indiana, Police Detective Sean Killian submitted his written, sworn affidavit to the St. Joseph County, Indiana, Superior Court in support of his application for a "Search Warrant/Court Order" under 18 U.S.C. §§ 2703, 3122, 3123, and 3124, and under Indiana Code § 35-33-5-12, directing Sprint PCS to provide law enforcement officers with "telecommunications records and assistance" regarding phone number 574-xxx-1710 (belonging to the "target phone"), and regarding "any other phone numbers associated with this account for the 30-day periods before and after the signing of this Warrant," which occurred also on January 4, 2019. (Def. Hrg. Ex. A, ECF No. 66 at 4, 5.)

The information sought included cell site activations without geographical limitations, the numbers dialed, the incoming numbers, dialed digital data, call durations, subscriber information, and information regarding cell towers. The warrant application affidavit requested authority to use a pen register device in the form of a cell site simulator to send signals to the target phone so law enforcement could locate the target phone by its replies to the signals.[2] The affidavit stated, "All signal information data shall be deleted as soon as the Target Phone is located." (Id. at 7.)

In the affidavit, Det. Killian stated that Latoya Davis had filed a criminal complaint against Jackson, her ex-boyfriend, on December 30, 2018. On January 4, 2019, Ms. Davis went to the St. Joseph County Special Victims Unit to speak with detectives. She provided Jackson's phone number (574-xxx-1710), which is assigned to the target phone. Police verified that the target phone belonged to Jackson by calling the number and asking for "Keith." A male answered the phone and in the affirmative said, "Uh-huh." The male then abruptly ended the call, saying, "I'll call you back," which he did not do. Det. Killian's affidavit also stated that Jackson "is currently wanted out of Elkhart County for Possession of a Handgun by a Violent Felon." (Id. at 8.)

The affidavit further stated that "[p]inging the [target] phone number for the phone thought to be in [Jackson's] possession will assist investigators in locating the wanted party, Keith Jackson []." (Id.)

Judge Elizabeth Hardtke of St. Joseph County, Indiana, Superior Court signed and issued the document captioned "Search Warrant/Court Order" to Det. Killian on January 4, 2019. (Id. at 4.) In the Search Warrant/Court Order, Judge Hardtke found probable cause to believe "that the

---

[2]Pen registers record telephone numbers called from a particular phone. See S. REP. No. 99-541, at 10 (1986), as reprinted in 1986 U.S.C.C.A.N. 3555, 3564.

information likely to be obtained is relevant and material to an ongoing criminal investigation." The Search Warrant/Court Order ordered Sprint to furnish law enforcement agencies with the listed "telecommunications records and assistance" "for the period of time 30 days previous to the date of this Warrant, and extending 30 days after the signing of this Warrant [("60-day period of authorization")]." The requested records and assistance included the following, among numerous other items:

    1. Cell site activations without geographical limitations;

    2. Numbers dialed;

    3. Incoming numbers if identified;

(ECF No. 66 at 1-3). The warrant also authorized the use of a pen register and a trap and trace device during the 60-day period of authorization.[3] (Id. at 3.)

Also on January 4, 2019, the St. Joseph County, Indiana Special Victims Unit ("SVU") issued a Crime Information Bulletin to law enforcement seeking the location of Keith Jackson for questioning and warrant arrest (on an Elkhart County warrant) as a "**suspect** in an on-going SVU investigation where [Jackson] is alleged to have pointed a handgun at his ex-girlfriend, fired it in her house, and held her captive for several hours." (Def. Hrg. Ex. A, ECF No. 66-1 at 71). The Bulletin warned, "Caution: Subject Considered Armed and Dangerous," and also stated:

> Jackson's current whereabouts are unknown. He is known to frequently be armed. His ex-girlfriend has expressed he is suicidal and concerned he will attempt **suicide by cop**. Jackson is thought to currently have a broken leg from running from police on 12/30.

(Id.)

---

[3]Trap and trace devices record the telephone numbers for all calls received by a particular phone. See S. REP. No. 99-541, at 10 (1986), as reprinted in 1986 U.S.C.C.A.N. 3555, 3564.

Det. Killian called Jackson on the target phone number on January 4, 2019. They spoke. Det. Killian called Jackson's phone several times between noon and 1:00 p.m. that day, and Jackson felt harassed as a result. He then destroyed the cellphone.

On January 5, 2019, Det. Killian contacted United States Secret Service Special Agent Jason Davis in the St. Louis area about Jackson's presence here. Agent Davis in turn contacted St. Louis County Police Det. Mark Berry to enlist his aid in locating Jackson. Det. Berry followed up by contacting Det. Killian directly. Det. Killian requested Berry's aid in locating fugitive Jackson in St. Louis County. Det. Killian told Det. Berry that Jackson had an active arrest warrant out of Elkhart County, Indiana for being a felon in possession of a firearm. Det. Killian also told Det. Berry that Jackson had possibly injured himself evading law enforcement by escaping out of a third-floor window in Indiana.

Det. Killian told Det. Berry he had gotten a warrant for "GPS pings"[4] on Jackson's phone. Based on those pings, Det. Killian said he believed Jackson was in the Jennings, Missouri area. Det. Killian emailed Det. Berry the GPS pings, which Berry reviewed. (Jackson Hrg, Ex. A, ECF No. 66-1 at 71.) Det. Killian also told Berry he believed Jackson traveled to Jennings in a blue 2004 Nissan Maxima with Indiana license plate YIU-610. The GPS pings indicated the related cell phone had left the State of Indiana and was now in the Jennings, Missouri area.

Det. Killian also provided Det. Berry with call records from Jackson's phone. These records showed that Jackson often called telephone number 314-xxx-8912 prior to January 2019. (ECF No. 66-1 at 62-77.) The 8912 telephone number had a St. Louis area code and belonged to

---

[4]The "pings" Det. Berry referred to were not real-time reflections of the exact coordinates of Jackson's locations. The report submitted in response to Indiana state court Judge Hardtke's Search Warrant/Court Order included a list of latitudinal and longitudinal coordinates with a radius in which Jackson was believed to be located. These pings and their radii were in Jennings, Missouri. (Def. Hrg. Ex. A, ECF No. 66-1.) This list of latitudinal and longitudinal coordinates included in Exhibit A are historical Cell Site Location Information ("CSLI").

Latoya Johnson. Det. Berry determined that Ms. Johnson lived at a specific address on Octavia Avenue in Jennings, Missouri. The detectives believed Keith Jackson might be found there.

Det. Berry also sought and received from a St. Louis County Circuit Court judge a search warrant for Jackson's telephone number to locate him, but this warrant was not executed and no search was conducted pursuant to it.

Det. Berry met with St. Louis County Det. Machens on January 8, 2019, to devise a plan to locate and arrest Jackson. They were assisted by five to eight other St. Louis County police officers. At approximately 9:00 a.m. the detectives and officers went to the area near Latoya Johnson's address on Octavia and placed it under surveillance. All officers were in unmarked vehicles and wore plainclothes with badges around their necks and ballistic vests labeled displayed "POLICE."

Upon arriving at address on Octavia, Det. Berry saw Jackson's blue 2004 Nissan Maxima with Indiana license plate YIU-610 parked in front of the house. About 15 minutes later, officers saw Keith Jackson come out of the front door of the house. Officers saw that he walked with a limp, consistent with the injury Det. Killian had told them about.

While Jackson was on the stairs leading away from the front of the house, the officers approached to arrest him. When Jackson saw the police and was looking easterly toward Det. Berry, officers saw Jackson take a handgun from his right jacket pocket and drop it into the grass on the west side of the stairs.

Officers immediately placed Jackson under arrest. Other officers found and seized the handgun from the grass next to the stairs, which was identified as a Smith & Wesson .380 with serial number RAB3507. The handgun was loaded with seven rounds of .380 ammunition.

The officers then searched Jackson's person. They found and seized two clear plastic baggies from his person. One baggie contained white prescription pills; the other contained a tan rock-like substance. From his experience and training Det. Berry reasonably suspected the tan rock-like substance was heroin. Both the prescription pills and tan rock-like substance were transferred to the St. Louis County Drug Lab. There it was later determined that the white pills were an over-the-counter medication, not a controlled substance. The tan rock-like substance was determined to be 4.49 grams of heroin.

The residence Jackson was seen leaving was searched but nothing of evidentiary value was seized.

Because Jackson had been injured in his earlier flight from police in Indiana, Det. Berry transported him to St. Mary's Hospital. In a post-arrest statement, Jackson told detectives he had injured himself jumping out of a window to evade law enforcement, as Det. Killian had told Det. Berry.

While Jackson was at the hospital in police custody and in a wheelchair, he asked to be taken outside to smoke a cigarette. Det. Berry agreed to Jackson's request. While outside the hospital, Det. Berry asked Jackson if he would give his written consent to the police obtaining a sample of his DNA by doing a buccal swab of the inside of his cheek. Berry gave Jackson a written consent form, which Jackson read and then signed. The consent form included the following paragraph:

> I, [signed "Keith Jackson"], hereby freely and voluntarily consent to provide a biological specimen for investigative purposes. I have been fully informed that the DNA profile developed from this sample may be entered into and retained in a DNA database. I am giving this permission freely and voluntarily, without any threats or promises having been made, and I have been advised that the results obtained from any such comparison testing may be used as evidence in a court of law.

Police Officer's Signature [signed Det. K. _____DSN]
Consent Signature [signed "Keith Jackson"]
Date of Birth: "03/03/98" Sex "M" Race "Black"
Street Address "711 Wolf St."
City and State "Elkhart, In 46516"
Other Witnesses "Det. Berry [DSN]"
[illegible signature [DSN]]
DNA Collection taken by (if applicable) "01/08/2019"
Complaint "#19-1290"

(Gov't Hrg. Ex. 2, ECF No. 68-2.)

Jackson signed the form without any coercion or inducement. When Jackson signed the form, he appeared to understand what he was doing and did not appear to be under the influence of any medicine. Jackson understood why the detectives were seeking his consent. He signed the form intentionally and voluntarily.

After Jackson signed the consent form, Det. Machens took a sample of defendant's DNA by two buccal swabs. The swabs were sent to the St. Louis County Crime Lab where they were processed. The DNA samples from the buccal swabs were compared to DNA recovered from the seized handgun. The DNA from the buccal swabs matched the DNA found on the slide and trigger of the seized handgun.

## III. Discussion

When a party objects to the magistrate judge's report and recommendation, the Court must conduct a de novo review of the portions of the report, findings, or recommendations to which the party objected. See United States v. Lothridge, 324 F.3d 599, 600 (8th Cir.2003) (citing 28 U.S.C. § 636(b)(1)). Pursuant to 28 U.S.C. § 636, the Court has conducted a de novo review of the Report and Recommendation. In so doing, the Court has carefully and independently reviewed the full record by reading the transcript of the evidentiary hearing held

by Judge Noce and all post-hearing briefing by the parties.[5] The Court has read and examined the exhibits that were admitted into evidence at the hearing. The Court has read Jackson's Objections and Supplemental Objections to the Order and Recommendation, the Government's Response in Opposition thereto, and Jackson's Reply in support of his Objections. Further, the Court has independently researched the controlling law.

Jackson objects to certain of the Magistrate Judge's factual findings and legal conclusions and the recommendation that Jackson's oral motion to suppress evidence be denied. The Court first addresses Jackson's objections that are directed to factual findings and the Magistrate Judge's interpretation of Jackson's arguments only.

A.    Objections to Factual Findings and Interpretation of Jackson's Arguments

Jackson first objects that the Magistrate Judge did not consider his Reply (ECF No. 79) to the government's post-hearing brief, because the Order and Recommendation did not list the Reply among the matters considered. This objection is moot as this Court has reviewed all of the filings.

Jackson objects that the factual finding in paragraph 4 erroneously states that on January 4, 2019, the St. Joseph County (Indiana) Special Victims Unit issued a Crime Information Bulletin to law enforcement seeking Jackson's location for questioning and for arrest under a warrant for pointing a handgun at his ex-girlfriend, firing it at her house, and holding her captive for several hours. (ECF No. 80 at 5, ¶ 4.). Jackson states that no arrest warrant had been or has since been issued concerning the allegations related to him pointing a handgun at his ex-girlfriend, as he was wanted only for questioning on those allegations. Jackson states that the arrest warrant issued on him was from Elkhart County, Indiana for a prior, unrelated charge. (See Gov't Ex. 4, State of Indiana Failure to Appear Warrant, based on a felony charge of Unlawful

---

[5]There was no written motion to suppress for the Court to review.

Possession of a Firearm by Serious Violent Felon). Jackson is correct and the Court modifies the factual finding to indicate that the warrant was from Elkhart County, Indiana, on charges unrelated to allegations that Jackson pointed a handgun at his ex-girlfriend.

Jackson next objects to the following statement on page 10 of the Order and Recommendation: "Defendant states that law enforcement officers contacted him on his cellphone while he was in Missouri by excessively calling and texting him. (ECF No. 75 at 3.) *He argues these phone calls and texts created [Cell Site Location Information] entries that allowed law enforcement to locate him.*"   (ECF No. 80 at (Emphasis added).

Jackson argues the emphasized statement misconstrues his argument, which was that "at the time law enforcement became 'authorized' to locate him through his cellular data, historical CSLI was the only means that could have been available." (ECF No. 88 at 3.) He says this is because he destroyed his cell phone after receiving these calls and texts, and therefore no real-time data could have been available, and this establishes the "certainty of Defendant being tracked only through the means of CSLI." (Id.) Defendant states that his "argument was [and] is concerned with the fact that law enforcement accessed his CSLI at all, in the first place." (Id.) The Court agrees Jackson did not argue that calls and texts from the Indiana law enforcement officer created CSLI that allowed Jackson to be located, and modifies the Order and Recommendation accordingly.

Jackson next objects to what he describes as the Magistrate Judge's factual finding that the cell phone records Indiana Detective Berry gave to St. Louis Detective Killian were only "pen trap data." Jackson's objection is not supported by the record. The Magistrate Judge found as a matter of fact:

> Det. Berry obtained from Det. Killian two types of digital information that was obtained by the execution of the Indiana state court's order on the digital

> communications provider Sprint: (1) CSLI GPS location data for defendant's cell
> phone and (2) the identification of telephone numbers whose phones
> communicated with defendant's phone (through the application of pen register
> and trace-and-trap digital technology)[.]"

(ECF No. 80 at 14) (footnotes omitted). Jackson's objection to this factual finding is overruled.

Jackson also objects to the Magistrate Judge's factual finding that "both groups of data" referenced in this paragraph, i.e. the CSLI location data for Jackson's cell phone and the telephone numbers that communicated with Jackson's phone, "related to the time after [Jackson] left Indiana and traveled to Jennings, Missouri." Jackson states that Defense Hearing Exhibit B shows the CSLI relates to a time frame almost a month before he left Indiana and came to Missouri. Jackson is correct and the Court modifies the factual findings accordingly.

Jackson also objects to the following statement in the Order and Recommendation:

> The Court has also found as a matter of fact that on January 5, 2019, Det. Killian
> provided Det. Berry both the CSLI GPS location data and the pen trap data, both
> only for the purpose of locating defendant. Nothing in the record indicates that
> either the CSLI GPS location data or the pentrap data indicate that defendant
> committed the federal offense with which he is charged in this judicial district.
> *Thus, defendant's request that the Court suppress the GPS location data is moot.*

(ECF No. 80 at 15) (footnote omitted) (emphasis added).

Jackson states that he never requested the Court to suppress the GPS location data. The Court agrees that Jackson did not seek to suppress GPS location data, and the Court disregards the emphasized sentence only.

B.    Objections to Legal Conclusions and Recommendation

The Court now addresses Jackson's objections to the Magistrate Judge's intertwined factual findings and legal conclusions that St. Louis officers located Jackson using only pen trap information, i.e., the record of cell phone calls Jackson made and that were made to him, that Jackson has no privacy interest in such call record information, and therefore the fruit of the

poisonous tree doctrine is therefore inapplicable and cannot form a basis for suppression of the evidence seized from Jackson.

Jackson's argument is that St. Louis County officers' seizure of a handgun, drugs, and DNA buccal swab evidence must be suppressed as the fruit of the poisonous tree. Jackson asserts that the Indiana officer illegally obtained his CSLI in violation of Carpenter v. United States, 138 S. Ct. 2206 (2018), used it to track him to Missouri, and then shared the illegally obtained information with St. Louis County law enforcement. Jackson argues that without the illegally obtained CSLI information, St. Louis County officers would have had no reason to believe he was in Jennings, Missouri, would not have located him there, would not have observed him, and would not have seized the gun, drugs, and DNA evidence. Jackson thus challenges the Search Warrant/Court Order ("Warrant") issued by the Indiana state court, which authorized law enforcement to obtain CSLI and other information from Jackson's cell phone, and seeks to suppress all evidence flowing from the Warrant as fruit of the poisonous tree.[6]

### 1.  Legal Standard

"The Fourth Amendment requires that search warrants be issued only upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and

---

[6]Jackson explains his argument in support of suppression as follows:

> The Defendant has requested the court to suppress the evidence obtained as a result of the unlawful search of his CSLI. The Defendant's argument is simply as follows: Law enforcement should not have "acquired" the Defendant's "historical CSLI under a court order pursuant to § 2703(d)." (Carpenter, supra, at 2221). When law enforcement "acquired" the Defendant's CSLI—cell phone records—that was an illegal "search." (Carpenter, Id. at 2220-21.) As a result of that illegal search, law enforcement obtained information that they otherwise would not have had. Acting solely upon the information obtained from the illegal search, law enforcement were able to locate the Defendant & seize evidence in connection therewith. Those circumstances embody the legal essence of the fruit of the poisonous tree doctrine. And that is the basis for the Defendant's request for suppression relief.

Def.'s Objs. To Order & Recommendation (ECF No. 88 at 7-8).

the persons or things to be seized." <u>Dalia v. United States</u>, 441 U.S. 238, 355 (1979) (internal quotations omitted). In <u>Dalia</u>, the Supreme Court explained that valid warrants "require only three things." <u>Id.</u> "First, warrants must be issued by neutral, disinterested magistrates." <u>Id.</u> (citations omitted). Second, the warrant may issue only upon a showing of "probable cause to believe that 'the evidence sought will aid in a particular apprehension or conviction' for a particular offense." <u>Id.</u> (quoting <u>Warden v. Hayden</u>, 387 U.S. 294, 307 (1967)). Third, the warrant "must particularly describe the things to be seized as well as the place to be searched." <u>Id.</u> (citations and quotations omitted).

Jackson does not contend that Indiana Superior Court Judge Hardtke was not a neutral, disinterested magistrate, or that the Warrant lacked particularity. Jackson does dispute that probable cause existed for the Warrant's issuance.

Probable cause exists when "there are sufficient facts to justify the belief by a prudent person that contraband or evidence of a crime will be found in the place to be searched." <u>United States v. Bieri</u>, 21 F.3d 811, 815 (8th Cir. 1994); <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983). "Probable cause requires only a showing of fair probability, not hard certainties." <u>United States v. Tripp</u>, 370 F. App'x 753, 757 (8th Cir. 2010) (quoting <u>United States v. Hudspeth</u>, 525 F.3d 667, 676 (8th Cir. 2008)).

"Affidavits for search warrants are reviewed using the 'totality-of-the-circumstances' analysis. <u>Gates</u>, 462 U.S. at 238. The task of the issuing judge is to make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the [judge] had a substantial basis for ...

concluding that probable cause existed." Id. at 238-39 (internal quotation marks omitted); see also Massachusetts v. Upton, 466 U.S. 727, 728 (1984). When the judge relied solely on the affidavit presented to him or her, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." United States v. Gladney, 48 F.3d 309, 312 (8th Cir. 1995) (quoted case omitted). Affidavits must be read in "a commonsense and realistic fashion." United States v. Caldwell, 864 F.2d 71, 74 (8th Cir. 1988) (citation omitted). "Deference is accorded an issuing [judge's] probable cause determination[.]" United States v. Brown, 584 F.2d 252, 256 (8th Cir. 1978).

For the reasons discussed below, the Court finds that the Indiana state court's Warrant authorizing the collection of information regarding Jackson's cell phone satisfies each of these requirements.

### 2.   Jackson's Argument Under Carpenter v. United States

Jackson's primary argument is that the Warrant was invalid under Carpenter, 138 S. Ct. 2206. In Carpenter, the Supreme Court held that a person has a legitimate expectation of privacy in the record of his physical movements as captured by historical cell site location information ("CSLI"). Carpenter, 138 S. Ct. at 2217. The Court found that seven days of historical CSLI obtained from a defendant's wireless carrier pursuant to an order under the Stored Communications Act ("SCA") was the product of a search within the meaning of the Fourth Amendment. Id. Finally, the Court concluded the government must obtain a search warrant based on probable cause before it can permissibly acquire historical CSLI from a wireless carrier, as usually "some quantum of individualized suspicion" is necessary before a search or seizure may take place. Id. at 2221 (cited case omitted).

Prior to Carpenter, federal courts held that under the SCA, 18 U.S.C. § 2703(d), an order authorizing the acquisition of historical CSLI was properly issued where the government showed "reasonable grounds" for believing the cell-site records were "relevant and material to an ongoing investigation." Id. at 2221. The SCA does not require an application for cell-site records to be accompanied by sworn affidavits. See 18 U.S.C. § 2703(d). The Supreme Court found such applications insufficient under the Fourth Amendment because they lacked a showing of probable cause. 138 S. Ct. at 2221. It concluded, "Before compelling a wireless carrier to turn over a subscriber's CSLI, the Government's obligation is a familiar one—get a warrant." Id.

Jackson argues that his historical CSLI was acquired through the impermissible means of a court order under the SCA, 18 U.S.C. § 2703(d), in contravention of the Supreme Court's Carpenter decision, which was issued six months prior to the Indiana court's order. Jackson points out that the Indiana state court's Search Warrant/Court Order (Def. Hrg. Ex. A), states it was issued pursuant to 18 U.S.C. §§ 2703(d), 3122, 3123, and 3124, "which [he asserts] deal exclusively with court orders," and Indiana Code 35-33-5-12, which Jackson concedes authorizes use of a real-time tracking instrument. (Def. Post-Hrg. Brief, ECF No. 75 at 5).

Jackson contends, in essence, that the Warrant used to obtain his CSLI was the same type of administrative order discussed in Carpenter and, for the same reasons discussed in that case, his CSLI was obtained in violation of the Fourth Amendment. Thus, Jackson argues, the evidence seized from him must be suppressed as the fruit of this constitutional violation.

The Court finds Jackson's reliance on Carpenter is unavailing under the facts of this case. The fact that the Warrant referenced the Stored Communication Act, among other statutes, is not determinative. The Affidavit for Search Warrant/Court Order and the Warrant itself are more extensive than the mere Stored Communications Act application and certificate of relevance to

an ongoing application that was at issue in <u>Carpenter</u>. In this case, the Warrant was issued by a neutral and detached judicial officer who found that probable cause existed that there was a need to locate and question Jackson concerning criminal activity, and that probable cause was established by the sworn affidavit submitted in support of the Warrant. Jackson's reliance on <u>Carpenter</u> is misplaced and the case is distinguishable, because in <u>Carpenter</u> no sworn attestation of actual criminal activity was made and no judicial finding of probable cause was issued.

Jackson's challenge to the Warrant in this case glosses over the fact that at the time it was issued, Jackson was a fugitive and subject to a valid Indiana state arrest warrant.[7] In an effort to locate Jackson for questioning on the allegations that he fired a gun at his girlfriend, and to arrest him on the outstanding felony warrant, Indiana Det. Killian submitted an Affidavit to obtain the Warrant, which subsequently authorized him to obtain telecommunications records including CSLI for Jackson's cell phone number 574-xxx-1710. The Warrant was supported by probable cause as to Jackson's fugitive status and being wanted for questioning, and authorized electronic surveillance of Jackson's movements in order to locate him for purposes of questioning and effecting his arrest.

The Court also finds the Warrant at issue here was sufficiently supported by Det. Killian's affidavit, which connects Jackson to cellular phone number 574-xxx-1710, demonstrates probable cause to believe the target phone was in Jackson's possession, and demonstrates the existence of the arrest warrant. The sworn affidavit provided Judge Hardtke with information that there was an active warrant commanding law enforcement to arrest Jackson, Jackson was wanted for questioning in connection with a second incident involving use

---

[7]Jackson does not challenge the issuance or validity of the Indiana arrest warrant.

of a gun, and the information learned through the Warrant would likely provide law enforcement with Jackson's location so he could be arrested and questioned.

The Court concludes that Judge Hardtke had a sufficient basis upon which to conclude that probable cause existed for issuance of the Warrant. As a result, Jackson's Motion to Suppress all evidence seized incident to his arrest as fruit of the poisonous tree flowing from the Warrant will be denied.

C.       The Exclusionary Rule and the Attenuation Doctrine

Even if the Court were to assume the Warrant was not supported by probable cause, suppression of the evidence is not required under the circumstances of this case.

"Under [the exclusionary] rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." United States v. Calandra, 414 U.S. 338, 347 (1974). This prohibition "reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree." United States v. Hastings, 685 F.3d 724, 728 (8th Cir. 2012) (internal quotation omitted). The rule operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." Calandra, 414 U.S. at 348.

Exclusion of evidence does not necessarily follow from every Fourth Amendment violation. Rather, the exclusionary rule is applied in limited circumstances: "those 'unusual cases' where it may "appreciably deter governmental violations of the Fourth Amendment." United States v. Katzin, 769 F.3d 163, 170 (3d Cir. 2014) (citing United States v. Leon, 468 U.S. 897, 909 (1984)); see also Hudson v. Michigan, 547 U.S. 586, 591-92 (2006) (whether

suppression is appropriate is a separate question from whether a defendant's Fourth Amendment rights were violated). In deciding if the exclusionary rule will apply in a particular situation, courts weigh the benefits of the deterrent effect against the social costs of exclusion. Herring v. United States, 555 U.S. 135, 141 (2009). The Supreme Court has explained these costs:

> Exclusion exacts a heavy toll on both the judicial system and society at large. It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment. Our cases hold that society must swallow this bitter pill when necessary, but only as a "last resort." For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.

Davis v. United States, 564 U.S. 229, 237 (2011) (internal citations omitted).

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence, United States v. Phillips, 540 F.2d 319 (8th Cir. 1976), but on the government to justify a warrantless search. United States v. Bruton, 647 F.2d 818 (8th Cir.1981)." Carter v. United States, 729 F.2d 935, 940 (8th Cir. 1984). In so doing, the government may show that a warrantless search falls within "certain reasonable exceptions." Kentucky v. King, 563 U.S. 452, 459 (2011).

Here, the government argues that even if a constitutional violation occurred when Jackson's CSLI was obtained, suppression is unwarranted under the attenuation doctrine.[8] The attenuation doctrine is an exception to the exclusionary rule that applies "when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by

---

[8] Jackson argues the Court should not consider the government's attenuation doctrine argument because it was not raised before the Magistrate Judge. This Court ordered the government to respond to Jackson's Objections to the Order and Recommendation and, in particular, his exclusionary rule/fruit of the poisonous tree argument (ECF No. 89). The Court concludes that Jackson did not show a constitutional violation occurred when his CSLI was obtained, but now also analyzes Jackson's motion to suppress as if no probable cause existed for the Indiana court's Warrant. As such, the government may attempt to meet its burden to establish that an exception to the exclusionary rule applies.

some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" Utah v. Strieff, 579 U.S. 232, 238 (2016) (quoting Hudson, 547 U.S. at 593). "The attenuation doctrine evaluates the causal link between the government's unlawful conduct and the discovery of evidence, which often has nothing to do with a defendant's actions." Id.

The Eighth Circuit Court of Appeals uses a three-part test to determine whether the attenuation doctrine applies. "First, we look to the temporal proximity between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. Second, we consider the presence of intervening circumstances. Third, and particularly significant, we examine the purpose and flagrancy of the official misconduct." United States v. Lowry, 935 F.3d 638, 642-43 (8th Cir. 2019) (quoting Strieff, 579 U.S. at 239).

The first factor, temporal proximity, favors attenuation only when substantial time elapses between an unlawful act and when the evidence is obtained. Strieff, 579 U.S. at 239. Here, the temporal proximity between the claimed unlawful search—Indiana law enforcement obtaining Jackson's CSLI on January 4, 2019—and Jackson's arrest in Jennings, Missouri on January 8, 2019, is substantial and does not favor suppressing the evidence. Cf. Streiff, id. (first factor did not favor attenuation when only minutes passed between the unlawful act and the discovery of evidence).

The second factor, the presence of intervening circumstances, strongly favors attenuation here. Once the St. Louis County officers observed Jackson, who they knew to be a felon, in possession of a firearm that he discarded while in plain view, they had probable cause to arrest and search him for the independent crime of being a felon in possession of a firearm. See United

States v. Banks, 514 F.3d 769, 773 (8th Cir. 2008) ("Observing objects in plain view violates no reasonable expectation of privacy, which obviates the need for a search warrant.").

This Court has also held, after Carpenter, that officers' knowledge of the existence of an arrest warrant is an intervening circumstance for purposes of the second factor of the attenuation exception analysis. See United States v. Taylor, 4:20-CR-58 SEP/NAB, 2022 WL 3636860, at *11 (E.D. Mo. June 14, 2022), report and recommendation adopted by 2022 WL 3594581 (E.D. Mo. Aug. 23, 2022). In Taylor, the Court's analysis relied on the Seventh Circuit's decision in United States v. Patrick, 842 F.3d 540 (7th Cir. 2016) (holding the existence of an arrest warrant precludes suppression of evidence under the Supreme Court's decision in Strieff). See also United States v. Ellerman, 2023 WL 111982, at *3 (D. Minn. Jan. 5, 2023) (holding law enforcement may use a tracking warrant to locate an individual wanted on a valid arrest warrant; citing Taylor and concluding Patrick's rationale was not undermined by Carpenter). Here, St. Louis County officers were aware that Jackson had an outstanding arrest warrant.

The third factor, the purpose and flagrancy of the official misconduct, also favors attenuation. Jackson is correct that the St. Louis officers who arrested him would not have known he was in Jennings, Missouri absent the fact that his historical CSLI was obtained by Indiana Det. Killian. But the St. Louis County officers were relying on cellular phone records and information that they knew was obtained by means of a warrant signed by a state court judge. And once the officers were informed that Jackson was in the Jennings area, they used lawfully obtained pen trap data—the calls placed by Jackson's cell phone—and standard police investigative techniques to determine a likely location where Jackson might be found.

Unlike the situation in Carpenter, the cell phone data St. Louis County officers received from Indiana Det. Killian did not put Jackson at the scene of a crime, because the crime that is

the subject of the indictment in this case did not occur until January 8, 2019, four days after the last entry in the CSLI data provided by Det. Killian. Wholly independent of any historical CSLI, the crime charged in this case is based on the personal observations of law enforcement officers from a public vantage point: They saw Jackson, a known fugitive felon, walk out of a house and abandon a gun in plain view.

For these reasons, the Court concludes that even if the Indiana state court Warrant was issued without probable cause and is constitutionally invalid under Carpenter, evidence seized from Jackson by St. Louis County officers is admissible under the attenuation doctrine exception to the exclusionary rule.

        D.      Admissibility of DNA Evidence

Jackson does not challenge the Magistrate Judge's finding that he voluntarily consented for the police to take the buccal swabs. The Court finds after de novo review that the DNA evidence should not be suppressed.

**IV. Conclusion**

As set forth above, the Court modifies the Magistrate Judge's factual findings and interpretations of Jackson's legal arguments in certain specific respects.

After de novo analysis of the record and Jackson's oral motion to suppress, the Court concludes Jackson does not establish the existence of a constitutional violation based on the Indiana court's issuance of a Warrant for Jackson's cell phone information, including historical Cell Site Location Information, as the Warrant was based on probable cause and Carpenter is therefore distinguishable. Further, even assuming the existence of a constitutional violation, the Court concludes that the attenuation doctrine exception to the exclusionary rule applies. As such,

Jackson's fruit of the poisonous tree argument fails. The motion to suppress will be denied in all respects.

Accordingly, after de novo review,

**IT IS HEREBY ORDERED** that the Order and Recommendation of United States Magistrate Judge dated November 7, 2022, is **sustained, adopted** and **incorporated** herein in part, **as modified** by this Memorandum and Order. (ECF No. 80)

**IT IS FURTHER ORDERED** that Defendant's oral Motion to Suppress Evidence (ECF No. 20), as supplemented at the evidentiary hearing, is **DENIED**.

*Ronnie L. White*
_____
**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**

Dated this <u>1st</u> day of March, 2023.